IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

───────────────────────

BRUSH & NIB STUDIO, LC, et al., *Plaintiffs/Appellants/Cross-Appellees*,

*v.*

CITY OF PHOENIX, *Defendant/Appellee/Cross-Appellant*.

No. 1 CA-CV 16-0602
FILED 6-7-2018

───────────────────────

Appeal from the Superior Court in Maricopa County
No. CV2016-052251
The Honorable Karen A. Mullins, Judge

**AFFIRMED AS MODIFIED**

───────────────────────

COUNSEL

Alliance Defending Freedom, Scottsdale
By Jeremy D. Tedesco, Jonathan A. Scruggs, Samuel D. Green
*Co-Counsel for Plaintiffs/Appellants/Cross-Appellees*

Helm, Livesay & Worthington, Tempe
By Roberta S. Livesay
*Co-Counsel for Plaintiffs/Appellants/Cross-Appellees*

Osborn Maledon, P.A., Phoenix
By Colin F. Campbell, Eric M. Fraser, Joshua David Rothenberg Bendor
*Co-Counsel for Defendant/Appellee/Cross-Appellant*

Phoenix City Attorney's Office, Phoenix
By Brad Holm, Heidi E. Gilbert
*Co-Counsel for Defendant/Appellee/Cross-Appellant*

Margrave Celmins, P.C., Scottsdale
By Michael Kitchen
*Counsel for Amici Curiae Constitutional Jurisprudence*

Law Offices of Kevin L. Beckwith, P.C., Phoenix
By Kevin Beckwith
*Counsel for Amici Curiae Law and Economics Scholars*

Center for Arizona Policy, Phoenix
By William M. Clark
*Co-counsel for Amici Curiae Center for Religious Expression and Center for Arizona Policy*

Center for Religious Expression, Memphis, Tennessee
By Nathan W. Kellum, appearing *pro hac vice*
*Co-counsel for Amici Curiae Center for Religious Expression and Center for Arizona Policy*

Joshua Carden Law Firm, P.C., Scottsdale
By Joshua Carden
*Co-counsel for Amici Curiae Coalition for Jewish Values, Ethics and Religious Liberty Commission, Jews for Religious Liberty, and The Rabbinical Alliance of America, Inc.*

Perkins Coie LLP, Phoenix
By Daniel C. Barr, Barry Grant Stratford, Katherine Elizabeth May
*Counsel for Amicus Curiae Arizona Businesses*

Mayes Telles PLLC, Phoenix
By Jessica Hernandez
*Co-counsel for Amicus Curiae Lambda Legal Defense and Education Fund, Inc.*

Lambda Legal Defense and Education Fund, Inc., Los Angeles, California
By Jennifer C. Pizer, Nancy C. Marcus, both appearing *pro hac vice*
*Co-counsel for Amicus Curiae Lambda Legal Defense and Education Fund, Inc.*

American Civil Liberties Union, Phoenix
By Kathleen E. Brody
*Co-counsel for Amici Curiae American Civil Liberties Union, American Civil Liberties Union of Arizona, Arizona Trans Youth & Parent Organization, Equality Arizona, GLSEN Phoenix, Human Rights Campaign, One n Ten, Phoenix Pride, Southern Arizona AIDS Foundation, Southern Arizona Gender Alliance, Southern Arizona Senior Pride, Trans Queer Pueblo, Trans Spectrum of Arizona*

American Civil Liberties Union, New York, New York
By Brian Hauss, appearing *pro hac vice*
*Co-counsel for Amicus Curiae American Civil Liberties Union, American Civil Liberties Union of Arizona, Arizona Trans Youth & Parent Organization, Equality Arizona, GLSEN Phoenix, Human Rights Campaign, One n Ten, Phoenix Pride, Southern Arizona AIDS Foundation, Southern Arizona Gender Alliance, Southern Arizona Senior Pride, Trans Queer Pueblo, Trans Spectrum of Arizona*

---

**OPINION**

Presiding Judge Lawrence F. Winthrop delivered the opinion of the Court, in which Judge Jennifer B. Campbell and Judge Paul J. McMurdie joined.

---

**W I N T H R O P**, Presiding Judge:

¶1 Joanna Duka and Breanna Koski ("Appellants") are the owners of Brush & Nib Studio, LC ("Brush & Nib"). Appellants filed a pre-enforcement action against the City of Phoenix ("Phoenix") challenging the constitutionality of Phoenix City Code 18-4(B) ("Section 18-4(B)") and seeking a preliminary injunction to bar enforcement of the ordinance. Appellants appeal the superior court's denial of their preliminary injunction and grant of summary judgment in favor of Phoenix. For the following reasons, we affirm as modified.

**FACTS AND PROCEDURAL HISTORY**

¶2 Brush & Nib is a for-profit limited liability company, which sells pre-fabricated and design artwork for home décor, weddings, and special events. Appellants provide retail goods and services to the public

3

and acknowledge they operate a place of public accommodation as defined in Phoenix City Code § 18.[1]

¶3         Appellants are devout Christians and believe their work is inextricably related to their religious beliefs.  Appellants' goods and services include both customer-directed projects (work created through a consultation between Appellants and their customer) and pre-fabricated merchandise (work created without Appellants' knowledge of how the items will be used or who will use those products).[2]  Appellants believe their customer-directed and designed wedding products "convey messages about a particular engaged couple, their upcoming marriage, their upcoming marriage ceremony, and the celebration of that marriage." Appellants also strongly believe in an ordained marriage between one man and one woman, and argue that they cannot separate their religious beliefs from their work.  As such, they believe being required to create customer-specific merchandise for same-sex weddings will violate their religious beliefs.

¶4         Appellants want to be able to legally refuse to create custom-made merchandise for all same-sex weddings.  Additionally, Appellants desire to post a public statement explaining their religious beliefs. Appellants' proposed statement, in part, would notify potential customers that "Brush & Nib Studio won't create any artwork that violates [their] vision as defined by [their] religious and artistic beliefs and identity," which includes "artwork that demeans others, endorses racism, incites violence, contradicts [their] Christian faith, or promotes any marriage except

---

[1]         Section 18-3 defines places of public accommodation as:

> [A]ll public places of entertainment, amusement or recreation, all public places where food or beverages are sold, public places operated for the lodging of transients or for the benefit, use or accommodation of those seeking health or recreation and all establishments offering their services, facilities or goods to or soliciting patronage from the members of the general public.  Any dwelling, any private club or any place which is in its nature distinctly private is not a place of public accommodation.

[2]         Appellants may utilize hand-painting and hand-lettered calligraphy in designing announcements, invitations, table and place cards, menus, wedding signs, and other specialized wedding décor.

marriage between one man and one woman." Appellants have not posted this statement because they believe it would violate Section 18-4(B). Instead, Appellants sought a preliminary injunction to bar Phoenix from enforcing Section 18-4(B) and a declaration that Section 18-4(B) violates the Arizona Constitution's free speech clause, religious toleration clause, equal protection clause, due process clause, and the Arizona Free Exercise of Religion Act ("FERA").[3]

¶5           Phoenix filed a motion to dismiss and the case proceeded to a bench trial before the superior court. The superior court denied Phoenix's motion to dismiss, finding Appellants had standing and the case was justiciable. The court then denied Appellants' motion for a preliminary injunction, finding Section 18-4(B) did not violate Appellants' freedom of speech nor substantially burden their exercise of religion. Appellants timely appealed the denial of the preliminary injunction to this court and moved to stay proceedings before the superior court. The court denied Appellants' request. Appellants then moved, and Phoenix cross-moved, for summary judgment. The court granted Phoenix's motion for summary judgment on all claims. Appellants filed a timely appeal from the court's summary judgment ruling and moved to consolidate that appeal with the appeal from the denial of the preliminary injunction.[4] We granted Appellants' request, and have jurisdiction over this consolidated appeal pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) (2016) and 12-2101(A)(1) (2016).

## ANALYSIS

¶6           Arizona courts have long upheld the public's right to participate in society without fear of discrimination. *See Phillips v. Phoenix Union High Schs.*, Maricopa Cty. Super. Ct. No. 72909 (1953) (enjoining Phoenix Union High Schools from segregating pupils based on race); *accord, Heard v. Davis*, Maricopa Cty. Super. Ct. No. 77497 (1954). The *Phillips* court expressly found that "democracy rejects any theory of second-class citizenship" and that "[a] half century of intolerance is enough." *Id.; see also* Paul Rees, *A Civil Rights Victory, Pre-Loving*, 53 Ariz. Att'y 84 (Aug. 2017)

---

[3]      Appellants do not raise in this appeal alleged violations of the religious toleration clause or their due process rights.

[4]      Phoenix filed a cross-appeal, arguing Appellants lacked standing.

(noting that Arizona repealed its anti-miscegenation law before the United States Supreme Court found such laws unconstitutional).

¶7        In 2014, however, the Arizona legislature sought to amend FERA to expand the definition of a protected person from "a religious assembly or institution" to "any individual, association, partnership, corporation, church, religious assembly or institution, estate, trust, foundation or other legal entity."  S.B. 1062, 2014 Leg., 51st 2d. Reg. Sess. (Ariz. 2014).  Although S.B. 1062 was ultimately vetoed, it was viewed by some as a reaction to the development of antidiscrimination ordinances, which included sexual orientation as a protected class, and the national trend in favor of granting broader rights to same-sex couples.  Dinita L. James, *Amid SB 1062 Frenzy, Tempe Becomes 4th AZ City to Protect LGBT Status*, 20 No. 11 Ariz. Emp. L. Letter 1 (2014).

¶8        Currently, nineteen states have enacted public accommodation antidiscrimination laws which include sexual orientation and gender identity as protected classes.  *See Equality Maps/Non-Discrimination Laws*, Movement Advancement Project (2018), http://www.lgbtmap.org/equality-maps/non_discrimination_laws. Arizona's public accommodation antidiscrimination statute, however, does not specifically include sexual orientation as a protected class.  *See* A.R.S. § 41-1442(A) (2017).  Accordingly, several Arizona cities have enacted broader ordinances to prohibit discrimination based on sexual orientation in places of public accommodation.  *See* TEMPE CODE CH. 2 Art. VIII § 2-601 (2014); FLAGSTAFF CODE CH. 14 § 14-02-001-0001 (2013); TUCSON CODE Art. II § 17-1 (1999).  Like Tempe, Flagstaff, and Tucson, Phoenix's Code, Section 18-4(B), as amended in 2013, prohibits discrimination in places of public accommodation based on sexual orientation.  Section 18-4(B) provides that:

> No person shall, directly or indirectly, refuse, withhold from, or deny to any person, or aid in or incite such refusal, denial or withholding of, accommodations, advantages, facilities or privileges thereof because of race, color, religion, sex, national origin, marital status, sexual orientation, gender identity or expression, or disability nor shall distinction be made with respect to any person based on race, color, religion, sex, national origin, marital status, sexual orientation, gender identity or expression, or disability in connection with the price or quality of any item, goods or services offered by or at any place of public accommodation.

It is unlawful for any owner, operator, lessee, manager, agent or employee of any place of public accommodation to directly or indirectly display, circulate, publicize or mail any advertisement, notice or communication which states or implies that any facility or service shall be refused or restricted because of race, color, religion, sex, national origin, marital status, sexual orientation, gender identity or expression, or disability or that any person, because of race, color, religion, sex, national origin, marital status, sexual orientation, gender identity or expression, or disability would be unwelcome, objectionable, unacceptable, undesirable or not solicited.

Phoenix City Code § 18-4(B)(2)-(3) (2013).[5]

**¶9** On appeal, Appellants raise a myriad of constitutional issues, arguing that Section 18-4(B) is unconstitutional, both on its face and as-applied, and that any enforcement of Section 18-4(B) would violate their First Amendment right to free speech and free exercise of religion under state law. Appellants are not the first to attempt to use their religious beliefs to justify practices others consider overtly discriminatory. *See Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) (finding a school, which prohibited interracial dating and marriage, could no longer receive tax-exempt status). Although the law has at times recognized religious beliefs as justification for discriminatory practices,[6] modern societal trends are to the contrary. *See*

---

[5] Section 18-4(B)(4) provides an exemption for *bona fide* religious organizations. Appellants have not asserted that they qualify as a *bona fide* religious organization.

[6] In *Loving v. Virginia*, the trial court sentenced the Lovings to jail because of their interracial marriage and stated that:

Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. And but for the interference with his arrangement there would be no cause for such marriages. The fact that he separated the races shows that he did not intend for the races to mix.

The United States Supreme Court vacated the sentence, finding laws which criminalized interracial marriage unconstitutional. 388 U.S. 1, 3 (1967).

*McLaughlin v. Jones*, 243 Ariz. 29, 33, ¶ 13 (2017) ("Denying same-sex couples 'the same legal treatment' in marriage . . . and 'all the benefits' afforded opposite-sex couples, 'works a grave and continuing harm' on [same-sex couples] in various ways—demeaning them, humiliating and stigmatizing their children and family units, and teaching society that they are inferior in important respects." (citing *Obergefell v. Hodges*, 135 S. Ct. 2584, 2600-02, 2604 (2015)); *see also Lawrence v. Texas*, 539 U.S. 558, 575 (2003) (finding when the state criminalizes same-sex couples' conduct it "is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres").

**¶10** While this case may be the first of its kind in Arizona, Brush & Nib is only one of numerous national litigants who seek to preserve and define their religious freedoms in the face of ordinances which prohibit places of public accommodation from discriminating based on sexual orientation. *See Elane Photography, LLC v. Willock*, 309 P.3d 53 (N.M. 2013) (finding a photographer's refusal to take photographs of a same-sex wedding violated New Mexico's antidiscrimination laws), *cert. denied*, 134 S. Ct. 1787 (2014); *Craig v. Masterpiece Cakeshop, Inc.*, 370 P.3d 272 (Colo. App. 2015) (finding Colorado's antidiscrimination statute, which prohibits places of public accommodation from refusing services on the basis of sexual orientation, did not violate the baker's freedom of speech or freedom of religion), *cert. denied*, No. 15SC738 (Colo. Apr. 25, 2016), *reversed on other grounds*, *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, No. 16-111, slip op. (U.S. June 4, 2018*); Washington v. Arlene's Flowers, Inc.*, 389 P.3d 543 (Wash. 2017) (finding a florist's refusal to provide custom arranged flowers for a same-sex wedding constituted sexual orientation discrimination and was unlawful under Washington's antidiscrimination law), *cert. docketed*, No. 17-108 (U.S. Jul. 17, 2017); *Telescope Media Grp. v. Lindsey*, 271 F.Supp.3d. 1090 (D. Minn. 2017) (finding the Minnesota Human Rights Act, which prohibits places of public accommodation from discriminating based on sexual orientation, does not infringe a business owner's First and Fourteenth Amendment rights); *Gifford v. McCarthy*, 137 A.D.3d 30 (N.Y.S. 3d. 2016) (finding venue rental owners could not refuse to rent space for a same-sex wedding).

**¶11** In light of these cases and consistent with the United States Supreme Court's decisions, we recognize that a law allowing Appellants to refuse service to customers based on sexual orientation would constitute a "grave and continuing harm." *Obergefell*, 135 S. Ct. at 2604. As most recently expressed by the Supreme Court:

Our society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth. For that reason the laws and the Constitution can, and in some instances must, protect them in the exercise of their civil rights. The exercise of their freedom on terms equal to others must be given great weight and respect by the courts. At the same time, the religious and philosophical objections to gay marriage are protected views and in some instances protected forms of expression. As this Court observed in *Obergefell v. Hodges*, 135 S. Ct. at 2584, "[t]he First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths." *Id.* at 2607. Nevertheless, while those religious and philosophical objections are protected, it is a general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law. *See Newman v. Piggy Park Enterprises, Inc.*, 390 U.S. 400, 402 n.5 (1968) (*per curiam*); *see also Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 572 (1995) ("Provisions like these are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments").

*Masterpiece Cakeshop, Ltd.*, slip op. at 9-10.

**¶12** With this background in mind, we address each of the parties' arguments in turn.

### I. Standing

**¶13** As an initial matter, Phoenix argues in its cross-appeal that Appellants' claims fail for lack of standing and ripeness because no case or controversy exists. The parties agree that, in this case, the underlying concerns for standing and ripeness are the same; accordingly, we address both issues under one analytical framework. *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) ("The constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong.").

¶14 The Arizona Constitution, unlike that of the United States, does not expressly limit courts to only deciding matters which involve a case or controversy. *Bennett v. Napolitano*, 206 Ariz. 520, 525, ¶ 19 (2003). We find, however, "that as a matter of sound jurisprudence a litigant seeking relief in the Arizona courts must first establish standing to sue." *Id.* This is especially true "in actions in which constitutional relief is sought against the government." *Id.* at 524, ¶ 16 (citing *Sears v. Hull*, 192 Ariz. 65, 71 (1998)). Further, although federal law does not govern our standing analysis, we look to federal law as instructive on the issue. *Id.* at 525, ¶ 22.

¶15 Phoenix relies on *Thomas v. Anchorage Equal Rights Comm'n* to argue Appellants have not asserted a justiciable claim. 220 F.3d 1134. In *Thomas*, the Ninth Circuit addressed its ability to hear a pre-enforcement action which alleged that Alaska's housing law, which prohibited landlords from discriminating against couples based on marital status, violated the landlords' First Amendment rights. *Id.* The *Thomas* court found that "neither the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement." *Id.* at 1139. Instead, a party may establish standing if she shows she suffered a "genuine threat of imminent prosecution." *Id.* (quoting *San Diego Cty. Gun Rights Comm'n v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996)). A "genuine threat of imminent prosecution" exists if a party establishes a concrete plan to violate the law, the authorities intend to prosecute the party, and there is a history of past prosecution or enforcement. *Id.* (citing *San Diego Cty. Gun Rights Comm'n*, 98 F.3d at 1126-27). A party, thus, need not suffer arrest or actual prosecution before challenging a law. *Susan B. Anthony List v. Dreihaus*, 134 S. Ct. 2334, 2342 (2014); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat.").

¶16 Although Appellants have not yet refused services to a same-sex couple, we find their claims are justiciable.[7] Here, Appellants have a concrete plan to violate Section 18-4(B) by refusing to create "custom-made" announcements and invitations for same-sex weddings and by posting a statement about their commitment to their religious beliefs, which

---

[7] At the time Appellants filed their complaint they had not yet received a request to provide services for a same-sex wedding. After they filed their complaint, however, they received such a request, though both the court and Appellants agreed the request was likely in retaliation for Appellants' lawsuit. Appellants did not respond to the inquiry.

includes refusing to create design-on-request merchandise for same-sex weddings. Additionally, Phoenix acknowledges that Appellants would violate Section 18-4(B) if they posted their proposed statement. Moreover, unlike *Thomas*, where the parties brought a pre-enforcement challenge to a statute that had been in effect for over twenty years, but had never been enforced, here, Section 18-4(B) has only been in effect since 2013 and Phoenix has received and investigated complaints arising from the ordinance. Appellants' concrete plan to refuse to provide services for same-sex weddings, Phoenix's likelihood of prosecution, and the history of enforcement, although brief, is sufficient to confer standing onto Appellants.

> ## II. *Standard of Review*

**¶17**     Summary judgment is proper if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(a); *Orme Sch. v. Reeves*, 166 Ariz. 301, 305 (1990). We review the grant of summary judgment *de novo*, and view the evidence in the light most favorable to the party opposing the motion.[8] *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 482, ¶ 13 (2002).

**¶18**     Appellants appear to have raised both facial and as-applied challenges to Section 18-4(B). Generally, to succeed on a facial challenge a party "must establish that no set of circumstances exists under which the [law] would be valid." *State v. Seyrafi*, 201 Ariz. 147, 153, ¶ 28 (App. 2001) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). This heavy burden lightens, however, if a party raises a facial challenge which implicates First Amendment rights. *Boehler*, 228 at 35, ¶ 5. In a First Amendment challenge we consider whether the application of that law "as a whole prohibits a 'substantial' amount of protected speech in relation to its many legitimate applications." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003). Even if a law burdens a substantial amount of free speech, we will not prohibit its enforcement if the law "reflects 'legitimate state interests in

---

[8]     We recognize the standard of review for a preliminary injunction is different from that of a summary judgment. *See Planned Parenthood Ariz., Inc. v. Am. Ass'n of Pro-Life Obstetricians & Gynecologists*, 227 Ariz. 262, 268, ¶ 9 (App. 2011). We need not address Appellants' appeal from the superior court's preliminary injunction ruling because we find Appellants failed to establish that they are entitled to relief pursuant to a *de novo* review. It follows that Appellants would fail to establish they are entitled to preliminary injunctive relief pursuant to an abuse of discretion review.

maintaining comprehensive control over harmful, constitutionally unprotected conduct.'" *Id.* at 119 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).

¶19 Here, we need not distinguish between Appellants' facial and as-applied challenge because it has no bearing on the ultimate outcome of the case. *See Isaacson v. Horne*, 716 F.3d 1213, 1230 (9th Cir. 2013) (finding the "precise characterization of the Physicians' complaint . . . has little bearing on the resolution of the legal question"); *see also Citizens United v. Fed. Election Comm'n*, 588 U.S. 310, 331 (2010) (noting the distinction between facial and as-applied challenges is not well defined). Although Appellants are subject to a heavier burden for their facial claims, the difference is irrelevant because, as discussed below, Appellants fail to succeed on both their as-applied and facial challenges.

     *III.    Free Speech*

¶20 Appellants argue Section 18-4(B) impermissibly burdens their freedom of speech by forcing them to create custom-made goods for same-sex weddings and by prohibiting them from posting a statement that describes their religious objection to providing stationery and other services for same-sex weddings. Appellants attempt to distinguish their refusal to create custom-made work for same-sex weddings—which they argue is a lawful exercise of their freedom of speech and religion—from the refusal to serve a customer based on the customer's sexual orientation. We are unpersuaded by Appellants' distinction. Courts have consistently found "there is no basis for distinguishing between discrimination based on sexual orientation and discrimination based on someone's conduct of publicly committing to a person of the same sex." *Gifford*, 137 A.D.3d at 37 (quoting *Elane Photography, LLC*, 309 P.3d at 62, ¶ 18). Further, the Supreme Court disfavors the conduct/status distinction that Appellants advocate. *See, e.g.*, *Obergefell*, 135 S. Ct. at 2604 (finding discrimination based on sexual orientation deprives individuals of their fundamental right to marry the person of their choice); *Lawrence*, 539 U.S. at 575 (by criminalizing same-sex sodomy the state essentially discriminated against gay men); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) (noting "a tax on wearing yarmulkes is a tax on Jews").

¶21 In support, Appellants rely on *Coleman v. City of Mesa*, 230 Ariz. 352 (2012), to argue that custom-made works for weddings and the stationery business constitute pure speech, and thus Section 18-4(B) is only constitutional if it survives strict scrutiny. In *Coleman*, the Arizona Supreme Court held that the process of tattooing, as well as the associated business

of tattooing, constituted pure speech, and was entitled to First Amendment protections. *Id.* at 360, ¶ 31. Notably, the court did not address whether Mesa's denial of a permit to operate a tattoo parlor violated the business owners' free speech rights. *Id.* at 361, ¶ 36. Moreover, *Coleman* did not address the dichotomy between the speech of the artist and the speech of the patron choosing the message to be applied, and we do not read *Coleman* to approve using the First Amendment as a shield to protect a business owner's decision to discriminate against customers based on sexual orientation.

¶22          Whether we agree with Appellants that in certain hypothetical circumstances the operation of a stationery store, as well as the creation of design-on-request wedding-related merchandise, may constitute pure speech is irrelevant, because these hypotheticals are not at issue in this case. Instead, our inquiry is whether Section 18-4(B), which requires that Appellants provide equal services to customers regardless of sexual orientation, infringes their First Amendment rights, not whether Appellants have a free speech right to operate their stationery store. Thus, Appellants reliance on *Coleman* is misplaced.

¶23          The Arizona Constitution guarantees that "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." Ariz. Const. art. II, § 6. Appellants assert that the Arizona Constitution provides broader free speech protections than the United States Constitution. Even assuming this to be true, Appellants do not explain how, in this case, our analysis under Arizona's free speech clause would differ from our analysis under federal free speech jurisprudence. Thus, we analyze Appellants' free speech claim pursuant to federal law. *See State v. Stummer*, 219 Ariz. 137, 142, ¶ 16 (App. 2008) (applying federal free speech jurisprudence because courts have had limited opportunities to develop Arizona's free speech clause).

¶24          Appellants argue Section 18-4(B) compels them to speak in favor of same-sex marriages. We disagree. Although Section 18-4(B) may have an incidental impact on speech, its main purpose is to prohibit discrimination, and thus Section 18-4(B) regulates conduct, not speech. Because Section 18-4(B) regulates conduct, we find the Court's analysis and holding in *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47 (2006), to be most applicable to the issue here. In *Rumsfeld*, the Supreme Court upheld the constitutionality of the Solomon Amendment, which required that institutions seeking federal funding must allow military recruiters the same access to students as other employers. *Id.* at 54. The Forum for Academic and Institutional Rights, Inc. ("FAIR"), an association of law

schools and law faculties, sought to bar the military's presence on campus because it opposed the military's policy of forbidding individuals from joining the Armed Forces if they "engaged in homosexual acts," identified as "homosexual," or "married a person of the same sex." *Id.* at 52 n.1. FAIR argued that the Solomon Amendment violated its First Amendment right of free speech and freedom of association by forcing the schools to allow military recruiters on campus. *Id.* at 52-53. The Supreme Court rejected FAIR's argument, finding the Solomon Amendment did not limit what schools could say, but rather what they could do. *Id.* at 60. The Supreme Court recognized that while in some circumstances the Solomon Amendment may require the schools to speak, such as by sending out e-mails notifying students about the military recruiters' presence, this speech was merely incidental to the properly mandated conduct. *Id.* at 61-62.

¶25        We find *Rumsfeld* controlling in this case. Here, the primary purpose of Section 18-4(B) is to prohibit places of public accommodation from discriminating based on certain protected classes, i.e., sexual orientation, not to compel speech. *See Elane Photography, LLC*, 309 P.3d at 64, ¶ 27 (finding New Mexico Human Rights Act "only mandates that if Elane Photography operates a business as a public accommodation, it cannot discriminate against potential clients based on their sexual orientation," but does not compel speech). Like *Rumsfeld*, Section 18-4(B) requires that places of public accommodation provide equal services if they want to operate their business.[9] While such a requirement may impact speech, such as prohibiting places of public accommodation from posting signs that discriminate against customers, this impact is incidental to properly regulated conduct.

¶26        Appellants try to distinguish *Rumsfeld* by relying on *Coleman*'s holding that tattoos, and the business of tattooing, are pure speech, and by citing *dicta* in the Colorado Court of Appeals' decision in *Masterpiece Cakeshop* that "a wedding cake, in some circumstances, may convey a particularized message celebrating same-sex marriage, and in such cases, First Amendment speech protections may be implicated." 370 P.3d at 288, ¶ 71. We are unpersuaded by this argument. We do not doubt that "words" are generally considered pure speech. Or that, in some instances,

---

[9]        To the extent Appellants argue that Section 18-4(B) imposes unconstitutional conditions, this argument fails. To find an unconstitutional condition we must first find the waiver of a constitutional right. *See Niehaus v. Huppenthal*, 233 Ariz. 195, 202, ¶ 23 (App. 2013). Here, there is no such waiver.

an ordinance may infringe a stationery store's First Amendment right, if for example, like *Coleman*, the ordinance completely bars the store's ability to create stationery or to operate its business. Nor do we doubt that a law prohibiting a baker from writing certain words on a cake may implicate the First Amendment. None of these hypothetical First Amendment violations are currently before us, and they do not affect the outcome of this case. The case before us is one of a blanket refusal of service to the LGBTQ community and not a First Amendment challenge to a specific message requested by a specific customer.

¶27 Simply stated, if Appellants, as an economic entity, want to operate their for-profit business as a public accommodation, they cannot discriminate against potential patrons based on sexual orientation. It bears repeating that Section 18-4(B) regulates conduct, not speech. Accordingly, the conduct at issue is not the creation of words or images but the conduct of selling or refusing to sell merchandise—either pre-fabricated or designed to order—equally to same-sex and opposite-sex couples. This conduct, even though it may incidentally impact speech, is not speech. Further, allowing a vendor who provides goods and services for marriages and weddings to refuse similar services for gay persons would result in "a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to goods, services, and public accommodations." *Masterpiece Cakeshop*, *Ltd.*, slip op. at 10.

¶28 Although Section 18-4(B) regulates conduct, this is not the end our inquiry. Next, we must determine whether the conduct regulated by Section 18-4(B) is inherently expressive.[10] *Rumsfeld*, 547 U.S. at 65. Conduct is entitled to full First Amendment protections if the "speaker" intended to convey a particularized message by the conduct and if, given the

---

[10] At oral argument, Appellants primarily relied on *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995), to argue that forcing them to provide services for same-sex weddings violated their First Amendment right to free speech. Appellants' reliance on *Hurley* is misplaced. In *Hurley*, the United States Supreme Court found a parade was expressive conduct and that forcing an organization to include a gay, lesbian and bisexual group would alter the message of that expressive conduct. *Id.* at 573. As explained throughout this opinion, Appellants' act of creating stationery and wedding-related goods is not expressive conduct. Accordingly, the fact that Section 18-4(B) requires Appellants to provide the same services for same-sex weddings as opposite-sex weddings does not implicate their First Amendment rights.

surrounding circumstances, there was a strong likelihood that the speaker's message would be understood by those who viewed it. *Spence v. Washington*, 418 U.S. 405, 410-11 (1974). Like many similar cases decided in other jurisdictions, we find Appellants' act of creating design-to-order wedding announcements, invitations, and the like is not inherently expressive. *See Elane Photography, LLC*, 309 P.3d at 68, ¶ 41 ("While photography may be expressive, the operation of a photography business is not."); *Arlene's Flowers, Inc.*, 389 P.3d at 557 (finding the creation of floral arrangements is not inherently expressive); *Masterpiece Cakeshop, Inc.*, 370 P.3d at 286, ¶ 62 (concluding "the act of designing and selling a wedding cake to all customers free of discrimination does not convey a celebratory message about same-sex weddings likely to be understood by those who view it"); *Gifford*, 137 A.D.3d at 42 (finding "there is no real likelihood that the Giffords would be perceived as endorsing the values or lifestyle of the individuals renting their facilities as opposed to merely complying with anti-discrimination laws").

¶29        The mere fact that Section 18-4(B) requires Appellants to comply with the law does not render their creation of design-to-order merchandise for same-sex weddings expressive conduct. The items Appellants would produce for a same-sex or opposite-sex wedding would likely be indistinguishable to the public. Take for instance an invitation to the marriage of Pat and Pat (whether created for Patrick and Patrick, or Patrick and Patricia), or Alex and Alex (whether created for Alexander and Alexander, or Alexander and Alexa). This invitation would not differ in creative expression. Further, it is unlikely that a general observer would attribute a company's product or offer of services, in compliance with the law, as indicative of the company's speech or personal beliefs. *See Rumsfeld*, 547 U.S. at 65 (finding observers can appreciate the difference between sponsored speech and speech which is permitted because it is required by law). The operation of a stationery store—including the design and sale of customized wedding event merchandise—is not expressive conduct, and thus, is not entitled to First Amendment free speech protections.

¶30        The law has long recognized a state's authority to "create rights of public access on behalf of its citizens." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984) (citing *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980)). It follows that a state may prohibit businesses from posting discriminatory signs. *See Rumsfeld*, 547 U.S. at 62 (finding if Congress prohibits employment-based racial discrimination, then states can require employers to remove "White Applicants Only" signs as a proper restriction on conduct not speech); *accord Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011); *Pickup v. Brown*, 740 F.3d 1208, 1225 (9th Cir. 2014). *See also R.A.V. v.*

*City of St. Paul*, 505 U.S. 377, 389 (1992) ("[W]ords can in some circumstances violate laws directed not against speech but against conduct."). Thus, "[p]osting language on a website telling potential customers that a business will discriminate based on sexual orientation is part of the act of sexual orientation discrimination itself; as conduct carried out through language, [and] this act is not protected by the First Amendment." *Telescope Media Grp.*, 271 F.Supp.3d at 1112 (citing *Rumsfeld*, 547 U.S. at 62); *see also Masterpiece Cakeshop, Ltd.*, slip op. at 12 (noting that a baker interposing a sincere religious objection to providing a wedding cake for a gay couple was entitled to a neutral and respectful consideration of his claim, but disapproving of the baker or other businesses posting signs saying "no goods or services will be sold if they will be used for gay marriages," observing such would "impose a serious stigma on gay persons.").

¶31　　　Although Appellants are prohibited from posting discriminatory statements about their intent to refuse services for same-sex weddings, they may post a statement endorsing their belief that marriage is between a man and a woman and may post a disclaimer explaining that, notwithstanding that belief, Section 18-4(B) requires them to provide goods and services to everyone regardless of sexual orientation. Or they may post a disclaimer that the act of selling their goods and services to same-sex couples does not constitute an endorsement of their customers' exercise of their constitutional right to marry or any other activities. *See Hurley*, 515 U.S. at 576-77 (noting, in some circumstances, an individual can distance himself from expressive conduct by providing disclaimers that he does not identify with the speaker's viewpoint).

¶32　　　Appellants may have to change their proposed posting to ensure that they comply with Section 18-4(B). However, "an incidental burden on speech is no greater than is essential, and therefore is permissible . . . so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Rumsfeld*, 547 U.S. at 67 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). Section 18-4(B) satisfies this requirement. Antidiscrimination laws, like Section 18-4(B), are content and viewpoint neutral. *See Hurley*, 515 U.S. at 572 (finding Massachusetts' antidiscrimination statute, which is similar to Section 18-4(B), "does not, on its face, target speech or discriminate on the basis of its content, the focal point of its prohibition being rather on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds"); *see also Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 801 (9th Cir. 2011) ("As the Supreme Court has made clear, antidiscrimination laws intended to ensure equal access to the benefits of society serve goals 'unrelated to the

suppression of expression' and are neutral as to both content and viewpoint." (quoting *Jaycees*, 468 U.S. at 623-24)). Further, Phoenix clearly has a substantial interest in discouraging discrimination in places of public accommodation. The way to effectively accomplish this goal is to explicitly prohibit places of public accommodation from discriminating. While it is imaginable that there may be other ways to achieve this goal, that does not render Section 18-4(B) unconstitutional.[11]

## IV. *Expressive Association*

**¶33** Appellants additionally argue Section 18-4(B) compels expressive association. Concurrent with the First Amendment's right to free speech is the "right of expressive association." *Rumsfeld*, 547 U.S. at 68 (citing *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 644 (2000)). The right to associate, or not associate, "is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Dale*, 530 U.S. at 647-48 (citing *Jaycees*, 468 U.S. at 622). Thus, "implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *IDK, Inc. v. Clark Cty.*, 836 F.2d 1185, 1194 (9th Cir. 1988) (citing *Jaycees*, 468 U.S. at 622). The right to associate, however, is not absolute and "may be curtailed if necessary to further a significant

---

[11] Even assuming Section 18-4(B) directly regulates speech, it still survives constitutional scrutiny. Laws which are content and viewpoint neutral are subject to intermediate scrutiny. *See State ex rel. Napolitano v. Gravano*, 204 Ariz. 106, 112, ¶ 19 (App. 2002) ("If a regulation serves purposes unrelated to the content of the expression, it is neutral, even if it incidentally affects some speakers or messages but not others." (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Thus, to be constitutional, under this test, Section 18-4(B) needs only to further a substantial government interest unrelated to the suppression of free speech. *See United States v. O'Brien*, 391 U.S. 367, 377 (1968). We have previously found that antidiscrimination statutes are content and viewpoint neutral and unrelated to the suppression of speech. *See Hurley*, 515 U.S. at 572; *accord Alpha Delta Chi-Delta Chapter*, 648 F.3d at 801. Accordingly, Section 18-4(B), as an antidiscrimination ordinance which regulates the conduct of providing services in a place of public accommodation, is content and viewpoint neutral. Moreover, as explained throughout this opinion Phoenix has a substantial, if not compelling, interest in eradicating discrimination based on sexual orientation.

governmental interest like eliminating . . . public evils." *3613 Ltd. v. Dep't of Liquor Licenses & Control*, 194 Ariz. 178, 186, ¶ 36 (App. 1999) (quoting *Jaycees*, 468 U.S. at 622).

**¶34**     Although the First Amendment "fully protects expression about philosophical, social, artistic, economic, literary, ethical, and other topics . . . , it does not protect every communication or every association that touches these topics." *IDK, Inc.*, 836 F.2d at 1194 (citing *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 231 (1977)). Importantly, a state does not lose its ability to regulate commercial activity merely because the activity has a speech component. *Id.* A law, however, will be found to violate the right to "expressive association" if it requires the inclusion of an unwanted member, and that inclusion would significantly affect the group's association. *Dale*, 530 U.S. at 648-50.

**¶35**     We are unpersuaded by Appellants' argument that Section 18-4(B) infringes their freedom of association by requiring that they provide equal services to same-sex couples. Appellants operate an economic entity and a place of public accommodation; as such, they are prohibited from discriminating against customers based on a protected class. Further, although Appellants argue they created Brush & Nib pursuant to their religious beliefs, this alone does not bestow on Appellants the unfettered right of expressive association in their business. We do not dispute that some aspects of Appellants' operation of Brush & Nib may implicate speech in some regard, but the primary purpose of Brush & Nib is not to convey a particular message but rather to engage in commercial sales activity. Thus, Appellants' operation of Brush & Nib is not the type of expressive association that the First Amendment is intended to protect. *See IDK, Inc.*, 836 F.2d at 1195 (finding an association is not fully protected by the First Amendment if its "activities are not predominately of the type protected by the First Amendment" (quoting *Jaycees*, 468 U.S. at 635, (O'Connor, J., concurring in part)). Section 18-4(B)'s requirement that Appellants provide equal goods and services does not infringe their primary goal of operating a business; if anything, such mandate is more aligned with their commercial interests by requiring services be provided to a broader customer base.

**¶36**     Even assuming, *arguendo*, that Appellants' business constitutes an expressive association, Section 18-4(B) remains constitutional in scope and application. The right to associate may permissibly be infringed if the regulation is adopted to "serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Fraternal Order of Eagles, Inc., Tucson Aerie No. 180 v. City of Tucson*, 168 Ariz. 598, 602

(App. 1991) (quoting *Jaycees*, 468 U.S. at 623). We have previously found that eliminating discrimination constitutes a compelling interest. *See Jaycees*, 468 U.S. at 626 ("Assuring women equal access to such goods, privileges, and advantages clearly furthers compelling state interests."). Further we have found that antidiscrimination ordinances are not aimed at the suppression of speech, but at the elimination of discriminatory conduct. *Id.* at 625; *accord Telescope Media Grp.*, 271 F.Supp.3d at 1112. Appellants' compliance with Section 18-4(B) does not hinder their freedom to associate; as previously noted, Appellants remain free to disclaim and/or post their belief that their religion only recognizes marriage between one man and one woman. That said, however, Appellants cannot deny access to their goods and services based on potential customers' sexual orientation.

### V. *Overbroad and Vague*

**¶37** Appellants argue Section 18-4(B) is both overbroad and vague because it is unclear which actions would violate Section 18-4(B)(3), and because the ordinance applies to a substantial amount of protected speech. While certain words or phrases in Section 18-4(B), in isolation, may appear to be overbroad or vague, that does not render the ordinance unconstitutional. *See State v. Baldwin*, 184 Ariz. 267, 270 (App. 1995), *corrected* (Jan. 10, 1996) (finding we strive to give statutes a constitutional construction, and thus, shall give a limiting construction, where appropriate, to cure a statute of any "constitutional infirmity") (quoting *State v. Takacs*, 169 Ariz. 392, 295 (App. 1991)).

**¶38** A statute is unconstitutionally overbroad if it burdens or punishes constitutionally protected activities. *State v. Kessler*, 199 Ariz. 83, 87, ¶ 15 (App. 2000) (quoting *State v. Jones*, 177 Ariz. 94, 99 (App. 1993)). To determine whether a statute which regulates conduct is overly broad, we must assess on a case-by-case basis whether the overbreadth of the statute is real and substantial as it relates to its plainly legitimate sweep. *Broadrick*, 413 U.S. at 615. Thus, the mere fact that there are some impermissible applications of the ordinance is insufficient to render the entire ordinance overbroad. *Id.*; *see also United States v. Williams*, 553 U.S. 285, 293 (2008) (invalidating a provision as overbroad is a "strong medicine") (citing *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999)).

**¶39** Section 18-4(B) does not by its terms implicate speech. Thus, Appellants must prove that Section 18-4(B)'s overbreadth is real and substantial, which they have failed to do. We decline to entertain Appellants and amici's parade of hypotheticals that, if present, could potentially render Section 18-4(B) overbroad. Instead, we review on a case-

by-case basis whether the ordinance is overbroad. Here, Section 18-4(B) properly restricts Appellants from announcing they will discriminate against customers based on sexual orientation. As previously mentioned, Appellants are free to proclaim their religious beliefs, but must do so within the confines of the law.

**¶40** Appellants additionally argue that Section 18-4(B) is unconstitutionally vague because it "encourage[s] arbitrary and discriminatory enforcement." In response, Phoenix urges that we must construe Section 18-4(B) as objective because it prohibits statements which indicate that a person would *be unwelcome* as opposed to the subjective interpretation that Section 18-4(B)(3) prohibits statements that make a person *feel unwelcome*.

**¶41** A statute is unconstitutionally vague if it "fails to give a person of average intelligence reasonable notice of what behavior is prohibited or permits arbitrary and discriminatory enforcement." *Kessler*, 199 Ariz. at 87, ¶ 15 (quoting *State v. Steiger*, 162 Ariz. 138, 141-42 (App. 1989)). A statute, however, need not define proscribed conduct with absolute precision, but it must adequately warn an individual of the proscribed conduct. *State v. Burke*, 238 Ariz. 322, 325-26, ¶ 6 (App. 2015) (quoting *State v. McMahon*, 201 Ariz. 548, 551, ¶ 8 (App. 2002)); *see also Baldwin*, 184 Ariz. at 270 (finding undefined terms susceptible to multiple meanings does not necessarily render a statute unconstitutionally vague).

**¶42** Section 18-4(B)(3) provides that:

> It is unlawful for any owner . . . of any place of public accommodation to directly or indirectly display, circulate, publicize or mail any advertisement, notice or communication which states or implies that any facility or service shall be refused or restricted because of . . . sexual orientation . . . *or that any person, because of . . . sexual orientation . . . would be unwelcome, objectionable, unacceptable, undesirable or not solicited.*

(Emphasis added.)

**¶43** We are unable to interpret Section 18-4(B)(3)'s use of the words "unwelcome," "objectionable," "unacceptable," and "undesirable" in a way that would render Section 18-4(B)(3) constitutional. The presence of one invalid prohibition, however, does not invalidate all of Section 18-4(B)(3). *See City of Tempe v. Outdoor Sys., Inc.*, 201 Ariz. 106, 110, ¶ 12 (App. 2001) ("We need not invalidate the entire Ordinance if the invalid portion

can be severed from the remaining valid portions of the Ordinance.") (citing *Randolph v. Groscost*, 195 Ariz. 423, 426-27, ¶ 13 (1999)). Instead, we consider whether the invalid portion of Section 18-4(B)(3) can be severed from the remainder of the ordinance and assess whether "the valid portion, considered separately, can operate independently and is enforceable and workable." *Randolph*, 195 Ariz. at 427, ¶ 15.

¶44 Here, striking the second half of Section 18-4(B)(3)—which bans an owner of a place of public accommodation from making a person feel "unwelcome," "objectionable," "unacceptable," and "undesirable" based on sexual orientation—does not render the remainder of the ordinance unenforceable or unworkable. Moreover, removing this clause from Section 18-4(B)(3) does not "produce a result so irrational or absurd as to compel the conclusion that an informed [drafter] would not have adopted one portion without the other." *Randolph*, 195 Ariz. at 427, ¶ 15. The remainder of Section 18-4(B)(3) operates independently and is enforceable as intended. Given this construction, we need not find Section 18-4(B) unconstitutional; instead we construe the ordinance as lawfully prohibiting discriminatory speech, but allowing Appellants to disclaim personal support for same-sex marriage and to proclaim their religious beliefs. *See LaFaro v. Cahill*, 203 Ariz. 482, 488, ¶ 21 (App. 2002) ("We attempt to construe statutes with 'a reasonable and constitutional meaning' whenever possible in order to remove potential doubts regarding the statute's viability.") (quoting *McGovern v. McGovern*, 201 Ariz. 172, 178, ¶ 20 (App. 2001)).

¶45 We therefore sever the invalid portion of Section 18-4(B)(3), but leave the remainder of the ordinance intact.[12]

### VI. Free Exercise of Religion

¶46 Appellants argue Section 18-4(B) burdens their free exercise of religion under state law by requiring them to create "custom artwork to

---

[12] We strike the following language from Section 18-4(B)(3), "or that any person, because of race, color, religion, sex, national origin, marital status, sexual orientation, gender identity or expression, or disability would be unwelcome, objectionable, unacceptable, undesirable or not solicited."

celebrate and promote . . . marriage[s] outside of God's design for marriage as an institution between one man and one woman."[13]

¶47        FERA protects an individual's exercise of religion from undue governmental interference. A.R.S. § 41-1493.01 (2017); *see also State v. Hardesty*, 222 Ariz. 363, 365, ¶ 8 (2009). Under the statute, the "government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the rule is both "[i]n furtherance of a compelling government interest [and is] [t]he least restrictive means of furthering that compelling governmental interest." A.R.S. § 41-1493.01(B)-(C). Pursuant to FERA, a party must establish that her act or refusal to act is motivated by her religious belief, that the religious belief is sincerely held, and that the governmental action substantially burdens the exercise of religious beliefs. *Hardesty*, 222 Ariz. at 366, ¶ 10. Once a party establishes those elements, the burden shifts to the government to prove the action "furthers a compelling governmental interest" and is "[t]he least restrictive means of furthering that compelling governmental interest." *Id.* (citing A.R.S. § 41-1493.01(C)). What constitutes the "least restrictive means" depends on the compelling interest at stake. *Id.* at 368, ¶ 19. FERA parallels the Federal Religious Freedom Restoration Act of 1993; as such we look to federal law as instructive on this issue. *See Hardesty*, 222 Ariz. at 365, ¶ 8.

¶48        On appeal, Phoenix does not dispute that Appellants' desire to refuse to create wedding-related merchandise for same-sex weddings and to post an explanatory statement is motivated by their religious beliefs, nor does Phoenix dispute the sincerity of Appellants' beliefs. Thus, we

---

[13]        Brush & Nib does not explicitly argue on appeal that §18-4(B) violates the Free Exercise Clause of the First Amendment; however, even assuming such an argument was advanced, Phoenix's obligation is to not enact, interpret or apply its laws or regulations based on hostility to a religion or religious viewpoint. There is no evidence in the record to support any suggestion that Phoenix's adoption of §18-4(B), or its interpretation as it relates to Brush & Nib, has been anything other than neutral toward and respectful of their sincerely-expressed religious beliefs. *See Masterpiece Cakeshop, Ltd.*, slip op. at 16-18. Further, as noted by Justice Kagan in her concurring opinion in *Masterpiece Cakeshop, Ltd.*, "As this Court has long held, and reaffirms today, a vendor cannot escape a public accommodations law because his religion disapproves selling a product to a group of customers, whether defined by sexual orientation, race, sex, or other protected trait. A vendor can choose the product he sells, but not the customers he serves—no matter the reason." (Internal citation omitted.)

focus our inquiry on Appellants' burden to demonstrate that Section 18-4(B) substantially burdens their exercise of religious beliefs. A substantial burden on the free exercise of religion requires more than a government action which merely "decreases the spirituality, the fervor, or the satisfaction with which a believer practices his religion," and instead is akin to the government coercing an individual to act contrary to her religious beliefs or penalizing faith. *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1063 (9th Cir. 2008). To determine whether Section 18-4(B) places a substantial burden on religion we analyze whether the ordinance will force Appellants "to choose between following the precepts of [their] religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of [their] religion in order to accept work, on the other hand," *Sherbert v. Verner*, 374 U.S. 398, 404 (1963), or whether the regulation "affirmatively compels [Appellants], under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972).

¶49         Here, Appellants have failed to prove that Section 18-4(B) substantially burdens their religious beliefs by requiring that they provide equal goods and services to same-sex couples. Appellants are not penalized for expressing their belief that their religion only recognizes the marriage of opposite-sex couples. Nor are Appellants penalized for refusing to create wedding-related merchandise as long as they equally refuse similar services to opposite-sex couples. Section 18-4(B) merely requires that, by operating a place of public accommodation, Appellants provide equal goods and services to customers regardless of sexual orientation. Appellants are free to discontinue selling custom wedding-related merchandise and maintain the operation of Brush & Nib for its other business operations. What Appellants cannot do is use their religion as a shield to discriminate against potential customers. Although providing the same goods and services to same-sex couples might "decrease . . . the satisfaction" with which Appellants' practice their religion this does not, *a fortiori*, make their compliance with Section 18-4(B) a substantial burden to their religion. *See Navajo Nation*, 535 F.3d at 1063.

¶50         Even if Appellants had met their burden of proof to demonstrate that Section 18-4(B) places a substantial burden on their religious exercise, Section 18-4(B) is still constitutional because Phoenix has a compelling interest in preventing discrimination, and has done so here through the least restrictive means. When faced with similar contentions, other jurisdictions have overwhelmingly concluded that the government has a compelling interest in eradicating discrimination. *See Arlene's Flowers, Inc.*, 389 P.3d at 565-66, ¶¶ 74-75 (compiling cases where the state's

compelling interest in eradicating discrimination survived strict scrutiny). It goes without saying that providing equal access to places of public accommodation does "not simply guarantee access to goods or services," but "serve[s] a broader societal purpose: eradicating barriers to the equal treatment of all citizens in the commercial marketplace." *Id.* at 566, ¶ 77. Appellants, however, argue that Phoenix does not suffer from pervasive sexual orientation discrimination, as evident from the historic lack of lawsuits to date, and that Phoenix could have used other means to achieve its goal, such as posting lists of businesses that will provide services for same-sex weddings. Other courts have addressed this "go elsewhere" argument and found it unpersuasive. We agree with those courts. *See Arlene's Flowers, Inc.*, 389 P.3d at 566, ¶ 77 (rejecting Arlene's "go elsewhere" argument and finding that the "case is no more about access to flowers than civil rights cases in the 1960s were about access to sandwiches"). Prohibiting places of public accommodation from discriminating against customers is not just about ensuring equal access, but about eradicating the construction of a second-class citizenship and diminishing humiliation and social stigma. The least restrictive way to eliminate discrimination in places of public accommodation is to expressly prohibit such places from discriminating.

### VII. *Equal Protection*

**¶51**  Appellants' final argument is that Section 18-4(B) violates their right to equal protection under state law because Section 18-4(B) "favor[s] artists who support same-sex marriage and punish[es] those who oppose it." We disagree.

**¶52**  Arizona's equal protection clause provides that "[n]o law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations." Ariz. Const. art. II, § 13. In interpreting Arizona's equal protection clause, we use the same standard as the federal equivalent. *Coleman*, 230 Ariz. at 361, ¶ 39. If a law discriminates against a suspect class or denies fundamental rights to one group it must meet a higher level of scrutiny to be constitutional. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). A law which does not infringe on any fundamental rights, however, is subject to rational basis review, and is constitutional if it "relate[s] to a legitimate government purpose." *State v. Panos*, 239 Ariz. 116, 118-19, ¶ 8 (App. 2016) (quoting *State v. Lowery*, 230 Ariz. 536, 541, ¶ 13 (App. 2012)).

¶53          Appellants have not alleged they are members of a suspect class; instead, they argue they are treated differently than other similarly situated businesses because "[a]rtists who support same-sex marriage can operate their businesses in accordance with their beliefs" whereas Appellants purportedly cannot.  Even assuming this to be true, it does not render Section 18-4(B) unconstitutional.  Section 18-4(B) applies to all places of public accommodation and all business owners equally, regardless of their beliefs.  Contrary to Appellants assertions, Section 18-4(B) does not infringe their fundamental rights by requiring that they provide equal goods and services to all customers regardless of sexual orientation.  As such, the provisions of Section 18-4(B) must only be rationally related to a legitimate governmental purpose.  As previously demonstrated, Phoenix has a legitimate governmental purpose in curtailing discriminatory practices, and prohibiting businesses from sexual orientation discrimination is rationally related to that purpose.  Thus, Section 18-4(B) does not violate Appellants' equal protection.

        *VIII.   Attorneys' Fees*

¶54          Both parties request attorneys' fees on appeal pursuant to A.R.S. § 12-342 (2016) and A.R.S. § 12-348 (Supp. 2017).  In the exercise of our discretion, we decline both requests, but award Phoenix its taxable costs, to be determined upon compliance with ARCAP 21.

**CONCLUSION**

¶55          We affirm as modified the superior court's summary judgment in favor of Phoenix.



AMY M. WOOD • Clerk of the Court
FILED:  AA

26